## 25501. MITCHELL v. THE STATE.

DECIDED SEPTEMBER 22, 1936.

*O. J. Coogler, Lee Hutcheson,* for plaintiff in error.
*Claude C. Smith, solicitor-general,* contra.

MACINTYRE, J. The special presentment in this case charges that on August 19, 1935, in Clayton County, Georgia, George Mitchell committed the crime of assault with intent to murder, by cutting and stabbing Grady Woodward with a knife. The defendant was convicted of the crime charged, and his exception is to the judgment overruling his motion for new trial containing the general and five special grounds.

The testimony of Grady Woodward was substantially as follows: The difficulty occurred between eight and nine o'clock at night, in front of the display-window of the building occupied by the Georgia Power Company in Jonesboro, Clayton County. Woodward was line-foreman for said company. He was required to work from "eight to five," but "had no duty to discharge for the

company that night, other than" he "was choosing to do." He was in the power company's building, checking up materials "for a line," when he heard some negroes making a noise in front of said display-window. He went out and found six or seven negroes in front of the window. He asked them to move away, and all of them except the defendant and another negro did move. Woodward then walked across an alley to a drug-store that was thirty or thirty-five feet from the power company's building. W. S. Brown, a deputy sheriff, John W. Chapman, another officer, and other persons were just outside the drug-store. Woodward remarked that he had asked the negroes "to move away five minutes ago." Every time Woodward looked at the defendant the latter was looking at him. Woodward walked by Brown, who was seated at the time, and without saying anything to the officer, and apparently without his knowledge or consent, took a blackjack from his coat pocket and walked back to where the defendant was standing "right at the corner where the glass is." Woodward further swore: "That negro was standing there looking at me all over. . . I walked by him [Brown] and got it [the blackjack], and walked up to the negro and said, 'Haven't I asked you to move away from here?' He said he didn't move, or something, I can't say exactly what he said. I taken a swing at him, and he taken and hit me in the side. . . I never did touch him when I swung at him. He had the knife open when I got back. . . I got pretty close before I saw the knife, and I was not in reaching distance of him when I seen it. . . I never touched this man until that night. . . I was trying to get him to move. As to whether that was on account of his strange look before I went back over there, I can't say. . . I thought it was devilment in him and he didn't aim to move. He had his knife out when I got in four feet of him. As to how rapidly I was going toward him with the blackjack at that time, I was going in an ordinary slow walk. I guess there was nothing to keep him from seeing me get the blackjack and start towards him. . . I had it right down by my side. . . I wouldn't say he did or did not see it." Woodward also testified that the negroes standing in front of the display-window were obstructing the view of the window.

J. W. Callaway testified, in part: "I was sitting . . in front of the drug-store. I suppose that is about twenty feet from

the power company's place of business, . . and while I was sitting there they all left except George. . . And Grady then directly come by Mr. Scott [Brown] and pulled his blackjack out of his pocket and went across over there, and just as he drew back to hit George he threw up his hand to catch him in the collar, I reckon, he caught him up there and hit at him in that way, and George reached under his arm that way with his knife. . . I am fairly positive I saw Mr. Woodward hit him at least one lick with that blackjack. . . As to whether any one angered that way usually goes at things pretty rapidly, and as to whether he was angered on that occasion, yes, sir, he told him before he got to him, three or four times, to move, and he hadn't done it, and he was going across there with the blackjack. . . I wouldn't swear there wasn't quick licks made that I didn't see. . . I was sitting pretty close to where Mr. Chapman and Brown were sitting. . . As to whether I heard a great deal of disturbance across there . . not that I know of. They were all standing up there, and all walked off except George."

W. S. Brown, a deputy sheriff testified, in part, as follows: "I was . . right in front of the Jonesboro Drug Company. I guess I was around thirty feet, across the alley . . from the show window of the Georgia Power Company . . there was half a dozen of us, I think, sitting down there in chairs. He says to me, 'I want you to look at that bunch of negroes in front of that window. I told them three or four times to stay away from that window, and they won't do it.' . . Mr. Woodward said he told them three or four times to stay out from that window; it was put there for a show window, and wasn't made to park beside. I said go and tell them one more time; and if they don't go away I will see what I can do. I seen his hand moving around and see Mr. Woodward step back. . . I couldn't see that this defendant was hit by Mr. Woodward. There was some movement made between him and the negro. . . I never seen him cut Mr. Woodward, and didn't see Mr. Woodward hit him. . . As to whether anybody hit him on the way to the jail, I couldn't say if they did. There was right smart squabbling down there, and I wouldn't say that they did or did not."

Officer John W. Chapman testified, in part, as follows: "Mr. Brown and myself ran over there when we seen something had

happened. I didn't come any further, only I went after the negro and stopped him. At the time I arrested the negro he was not hurt or bruised up in any way that I noticed. . . Mr. Brown and myself were talking, and it seemed like a lick was passed, and the negro fell back that way, and Mr. Woodward did too. . . I really didn't know what happened. . . I didn't have any time or occasion to make any examination to see whether or not he [defendant] was hurt. . . That was on the sidewalk right in front of the power company. It was on the corner next to the corner next to the alley. . . Whatever it was that happened attracted my attention, and I saw one lick passed: a commotion of some kind. It seemed to land on the defendant's head."

Os Roberts, city marshal, testified, in part: "I was sitting in front of the drug-store. . . Joe Callaway called my attention to Mr. Woodward slipping the blackjack out of Mr. Brown's pocket, and I thought he was kidding Mr. Brown. . . I just glanced up there when Mr. Brown walked over there. . . I saw him [Woodward] kind of draw back this way to hit. I don't know whether he hit him or not. . . I went over there, and he was facing the negro, . . and the negro had a knife in his hand, kind of drawed back this way. I told him to turn the knife loose, and he didn't do it, and the knife was open, and I hit him in the face with a blackjack, and taken the knife out of his hand."

E. L. Adamson testified that he struck the defendant once with his fist. Several witnesses testified to the defendant's good character. The defendant introduced testimony to the effect that Mr. Woodward hit him several licks with the blackjack before the defendant cut Woodward. After stating to the jury that he was not one of the original group in front of the power company's window, but that he was called over there, the defendant further stated: "I was thinking it [an invitation of one of the party to spend the day in south Atlanta] over, and when I saw this fellow he had done hit me. I said, 'Hold on there, wait a minute, I ain't the one you said get off the street;' and he hit me again, and all the time I had the knife in my hand, and he knocked me foolish, and I was trying to catch, or push him, or something. How he got cut I don't know, but I didn't cut him intentional." From Doctor H. D. Kemper's testimony, the wound in Woodward's side was of a deadly nature. Dr. Kemper testified: "I saw him [defendant]

in jail Sunday" (the day following the difficulty). "The left side of his face was swollen from the eye to the lip and down to the lower border of the jaw, cut or lacerated wound about two inches long running backward and slightly to the left of the crown of the head, three bruised places on the right side of the head from the forehead back, tender place on left side of head above and back of the right eye about the edge of the hair, skinned place on the left arm . . below the elbow; complaining of back; . . around the spine, slight swelling and discoloration at this point, some dry blood in the nose; . . what sort of instrument produced those [abrasions and lacerations about the crown of the head and on the head], well, it had to have been . . a blunt instrument, some hard blunt instrument. From the nature of those wounds and the nature of the instrument that in my opinion produced them, such an instrument as that could be one that is likely to produce death in the use of it."

Each of the special grounds avers that the court erred in giving to the jury the following charge, because there was no evidence authorizing it, and no evidence of any provocation offered by the defendant for the assault made upon him by Grady Woodward: "The law says also, gentlemen, that a person may not provoke an assault and then attack the person who has been so provoked and commit an assault upon him of another nature, and defend that assault, justify that assault, rather, by pleading self-defense. The law will not permit one person to provoke an assault himself and then attack the person who has been provoked and justify it on the ground of self-defense." "Under our Code, . . opprobrious words may justify a simple assault or an assault and battery, but they do not justify an attack with a deadly weapon, made in a manner likely to produce death; and if such was the nature of the attack upon the plaintiff in error, and if the sole provocation thereto was his language to Mitchell, the latter was engaged in the commission of a felony upon him, against which he had the right to defend himself to the extent, if necessary, of taking his assailant's life. . . Provocation of this kind not only does not justify a deadly assault, but is not such provocation as could be considered in mitigation, so as to reduce the assailant's guilt from murder to manslaughter, if the assault should prove fatal. . . Of course, if the purpose of the plaintiff in error in his language

and conduct on this occasion was to provoke an attack which should afford him a pretext for killing his assailant . . the necessity afterwards arising to kill in defense of his own life would not render the killing justifiable. The law will not hold him guiltless who thus creates the necessity to kill another. But if he had no such purpose as this, the fact that the language he had used to his assailant was the occasion of the difficulty would not render him chargeable with having brought on the assault or created the necessity to kill, if it should appear that the attack upon him exceeded the provocation and was of such an aggravated character as to be without any legal justification or excuse. He would not be responsible for a result which, in the eyes of the law, was not a legitimate result of his words or conduct, and which, therefore, he was not legally bound to anticipate. One who insults another by opprobrious words may be bound to anticipate that the person insulted will repel the insult to the extent the law allows, but he is not bound to anticipate that the latter will go to the extent of attempting to take his life; and if such an attempt is made upon no greater provocation than this, and the person thus assaulted kills his assailant under a reasonable belief that it is necessary to do so in order to save his own life, it is neither murder nor manslaughter. Where it is said in the decisions of this court that before a homicide can be treated as justifiable it must appear that the slayer was 'free from fault,' or did not 'provoke the difficulty,' this is to be understood as meaning, not that he must not have done anything which might in the ordinary sense of the word be regarded as provocation, but that the provocation must have been such as would in law be sufficient to justify the attack against which he was defending himself when the homicide was committed. Anything short of such provocation as this would not put the slayer in any degree in the wrong if it became necessary to kill in his own defense." *Butler* v. *State,* 92 *Ga.* 601 (5), 605 (19 S. E. 51). See also *Nixon* v. *State,* 101 *Ga.* 574 (28 S. E. 971). The *Butler* decision throws at least some light upon the meaning of "provocation," and also states clearly principles of law applicable to the case at bar. A careful examination of the record satisfies us that it does not appear from the evidence that the defendant "provoked" the assault made upon him by Mr. Woodward. If this conclusion is correct, it was harmful and reversible error to charge

upon the theory that he did provoke it. While it is true that there is nothing in the record to refute the doctor's testimony to the effect that the defendant made a deadly attack upon Woodward, and there is testimony from which the jury might have been left in a state of uncertainty as to whether Woodward inflicted the wounds found by the doctor on and about the defendant's head the day following the difficulty, we think that, even were the charge complained of applicable to the facts of the case, it should have been qualified by an instruction clearly embodying the principle suggested in the *Butler* case, supra, as follows: "If the assault upon the accused was made with a weapon likely to produce death and in a manner apparently dangerous to life, the fact that the accused provoked the assault by opprobrious words would not put him in the wrong for resisting it so far as was necessary to his defense; and a seeming necessity, if acted upon in good faith, would be equivalent to a real necessity."

*Judgment reversed. Broyles, C. J., and Guerry, J., concur.*